# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| TYRONE BURNS and MARVIN DORTCH, | Civil No. 06-4373 (JRT/FLN) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| THE WINROC CORPORATION (MIDWEST), | |
| Defendant. | |

Sheila K.K. Dokken and Lori C. Peterson, **LORI PETERSON & ASSOCIATES**, 10 South Fifth Street, Suite 700, Minneapolis, MN 55402, for plaintiffs.

Richard M. Dahl, Amy L. De Kok, and Katherine E. Becker, **MADIGAN, DAHL & HARLAN, P.A.**, 701 Fourth Avenue South, Suite 1700, Minneapolis, MN 55415, for defendant.

Plaintiffs Tyrone Burns and Marvin Dortch are African-Americans employed by defendant The Winroc Corporation (Midwest). Plaintiffs brought this action against defendant under 42 U.S.C. § 1981, Title VII, and the Minnesota Human Rights Act ("MHRA"), alleging a racially hostile work environment and retaliation in response to their discrimination complaints. Plaintiffs also bring a claim for common law negligence. This case is now before the Court on defendant's motion for summary judgment. For the reasons set forth below, defendant's motion is granted in part and denied in part.

# BACKGROUND[1]

Defendant is the Midwest affiliate of a corporation headquartered in Calgary, Canada. Defendant's primary business is supplying building and construction materials to contractors in and around Minneapolis and St. Paul. Defendant has two distribution centers in Minnesota, in Oakdale and Bloomington.

Plaintiff Burns was hired by defendant in September 2001. Burns eventually became a delivery driver, and was assigned his own delivery truck in 2003. Plaintiff Dortch was hired by defendant in August 2003. In early 2004, Dortch began working as a driver as well. Both plaintiffs are African-American, and both allege that their tenure with defendant has been marked by a pattern of racially discriminatory behavior. The alleged content of that discrimination is set forth in detail below.

Burns testified that several months after he was hired, he was scheduled to work a shift with John Mahoney. Before the shift began, Burns recalls one of his supervisors pulling him aside to warn him. Dan Burger, the supervisor, told him that he was "kind of worried about [Mahoney] saying racist, black jokes." (Dokken Aff., Ex. 1 at 272.) Burger told Burns "[j]ust kind of brush it off, don't pay him no attention." (*Id*.) The next day, Mahoney threw a telephone, and told Burns to "fetch, boy." (*Id*. at 171.) Burns reported the comment to Burger, one of his supervisors. According to Burns, Burger responded by saying "well, you know, some of the guys here are – you know, that's just

---

[1] The Court views the facts and evidence in the record in the light most favorable to plaintiffs, the non-moving party. *Riley v. Lance*, 518 F.3d 996, 999 (8th Cir. 2008).

the way that they are, some of them . . . you know, try not to pay it no attention." (*Id*. at 175.)

Burns also alleges that co-workers would approach him to tell "black jokes." (Dokken Aff., Ex. 1 at 172-73.)  Burns notes that in telling these jokes, his co-workers would frequently use the word "nigger." (*Id*.)[2]  Burns indicates that he reported these incidents to Burger, telling him "I just don't understand, you know, how, you know, guys just feel comfortable just saying that word [nigger] around me." (Dokken Aff., Ex. 1 at 179.)  According to Burns, Burger responded that "some of the guys are just ignorant and, you know, try not to pay it too much attention." (*Id*. at 173.)  Burger added, however, "[i]f it gets too out of hand . . . let me know, I'll take care of it, because you shouldn't have to hear that word if you're not comfortable with it." (Dokken Aff., Ex. 1 at 179.)

Burns alleges that in another incident, one of his co-workers referred to a former African-American employee as a "straight-out nigger," in a conversation in the breakroom. (Dokken Aff., Ex. 1 at 182.)  Burns recalls the rest of his co-workers looked

---

[2] As an example of one of these "jokes," Burns recounts the following contribution from co-worker Dave Strecker:

> Two black guys walking down the street and there was a sign that said, You can be white for a dollar or whatever, and the one had a dollar and the other one had 98 cents, and . . . the one that had the dollar said, Well, I'll tell you what, he said, I'll go in first and I'll see if it works and then if it comes out when I get the change, I'll give you the penny and you can go in or whatever – or give you the dollar. . . . And he said the guy went in there and came out with the dollar and he said, Hey, man, this works.  And he said, Well, hey, man, let me go in there and be white or whatever, and he says, Nigger, please, get a job[.]

(Dokken Aff., Ex. 1, at 176-77.)

at him for his reaction, "like I was going to really like jump up and fight or something like that." (*Id.*)  Burns alleges that Burger was present for this conversation, but did not say anything.

Burns also describes an incident involving Nick Kipes, a co-worker who often assisted both Burns and Dortch.  Burns indicates that he and Kipes got into an argument, and that Kipes "just starts saying that I'm sick of being on your guys' truck and I'm sick of listening to that black radio station."   (Dokken Aff., Ex. 1 at 190.)   Burns's interpretation of the exchange was that Kipes "was basically tired of working with two black guys." (*Id.*)  Burns reported the incident to Burger, and requested that Kipes be transferred to another truck.  Burger responded that Burns should "tell the fucker to shut his mouth," and the transfer did not occur until "about three months later." (*Id.*)

Burns recounts another incident that occurred when he brought his vehicle to work just after having "spinning rims" put on.  Burns was showing the rims to a group of co-workers that included Dortch and Jim Miller.  Karl Spott, another co-worker, approached the group and said "I'm not a racist or nothing, but you're really starting to act like a nigger now." (Dokken Aff., Ex. 1 at 197.)  Burns describes the reaction of Jim Miller, who would later become one of defendant's managers, as follows:  "Just smoked his cigarette and that was it.  Kind of – he kind of smirked after I kind of didn't respond to it." (*Id.* at 199.)

Burns also recounted the following incident involving Mark Wills, yet another co-worker:

> [W]hen he first came over to Bloomington he made a comment about Marvin looking like Ving Rhames.  And one of the things that he said was – he was talking about a movie called Rosewood.  Well in this movie, Rosewood, it was – they were hanging people and he talked about how when they had Ving Rhames on the – they had his neck in the noose and how when they made the horse move, how his lips were shaking.  And he goes, Man, did you see that fucker's lip, how that lip was just shaking, and just laughing about it.

(Dokken Aff., Ex. 1 at 212-13.)

Burns also generally recalls hearing comments about how African-American men have big penises, are lazy, and are criminals.  The comments included a specific incident where one co-worker told other co-workers that he believed Burns sold drugs, because Burns had purchased a $300,000 home.  (*Id*. at 286-87.)  Burns notes that Jim Miller "was right there and he heard about it," and that the incident was later the subject of a meeting between Burns and the co-worker.  (*Id*. at 287.)

Defendant acknowledges that plaintiff Burns had made reports to Burger, as described above, but notes that he never filed a "formal" complaint in accordance with its employment policy manual and never invoked union grievance procedures.  Defendant also alleges that Burns never used an employee "confidence line" available for anonymous complaints.

Dortch's allegations substantially replicate those of Burns.  He too recalls numerous "black jokes," various uses of the word "nigger," and both the spinning rims incident and the Rosewood incident.  Dortch never made any race discrimination or harassment complaints following these incidents.  Dortch avers that he was fearful that if he made such complaints – or initiated this lawsuit – he would lose his job, "because I

saw the level of the respect in the workplace was so lax when racial threats, gestures or inappropriate comments were seen by management as 'jokes.'"  (Dortch Aff., ¶3.)

Plaintiffs allege that this pattern was followed by a particularly severe incident in January 2006.  Defendant's Bloomington facility includes a warehouse where drivers park delivery trucks overnight.  On the evening of January 18, 2006, a Thursday, Burns's delivery truck was the only truck parked in the Bloomington warehouse, indicating that he would be returning to the warehouse on the following workday.  When Burns arrived at the warehouse the next morning, he discovered a noose slung over electrical wires near a warehouse bathroom.  The noose was hanging in a vertical fashion, in the manner in which it would appear if it were being used for a hanging.  This discovery came just days after Martin Luther King Jr. Day.  Both plaintiffs allege that they were in the warehouse the prior week and had not seen the noose.  This led plaintiffs to conclude that the noose was both intended to coincide with the holiday and intended to greet Burns when he arrived for his truck.

Burns brought Dortch to see the noose and took photographs of it, but did not immediately report it to supervisors or management.  Burns states that he expected defendant or other employees to notice the noose and remove it on their own.  On the following Monday, January 23, however, Burns observed that the noose was still up.  Burns then reported the noose to Mark Benson, one of his supervisors in the warehouse, and informed Benson that he was offended.  According to Burns, Benson suggested that the noose had been made by Wills, the employee who suggested that Dortch resembled a movie character being lynched.  Benson suggested that the noose had been up since the

prior summer, when Wills "was playing around with it."  (Dokken Aff., Ex. 1 at 205-06, 219-20.)  Burns responded that he knew the noose had not been up since the summer because he had been in the warehouse the week before.  Benson took the noose down, but told Burns that "[i]t ain't no big deal."  (*Id*.)

Burns then reported the noose directly to Jim Miller, one of defendant's managers.  At some point Benson entered this conversation and again suggested that the noose had been up since the prior summer.  (Dokken Aff., Ex. 1, at 227-28.)  Miller responded "[i]t doesn't matter if it was up there since the summer.  It should have never been up there, period."  (*Id* at 228.)  Dortch then entered the conversation as well, and when a co-worker asked him about the significance of the noose, he responded:

> [T]hat it was a way of hanging, you know, slaves and things like that and just black people and it was almost like over time took over as like a symbol as just the killing of black people.  And it happened to be, you know, Martin Luther King's birthday week to make it, you know, more relevant or what-not, or just to take it that way completely.

(Dokken Aff., Ex. 2, at 141.)  According to Dortch, following these comments Benson stated "I took it down.  It's no big deal no more.  It's over, you know."  (*Id*.)

Miller approached Dortch that afternoon and told him that he had discussed the matter with Al Miller, defendant's general manager for Minnesota.  Al Miller was away on business, but was interested in meeting with plaintiffs when he returned.

One or two days later, Wills approached plaintiffs to offer an apology.  Wills admitted that he had hung the noose, but said that it was a joke, that he had hung the noose earlier in the year, and that it was not directed at plaintiffs.  Dortch believed that

Wills was smirking during the apology, and neither plaintiff believed that the apology was sincere.

On January 25, 2006, plaintiffs met with both Jim Miller and Al Miller. Al Miller told the plaintiffs that they were going to investigate the incident, but that they had been told that the noose was simply a joke carried out by Wills. Dortch responded that he was "highly offended," and suggested suspending Wills. (Dokken Aff., Ex. 2, at 143-44.) Burns suggested that Wills be transferred to defendant's Oakdale facility. (*Id*.) Either Jim Miller or Al Miller responded that such a step would be difficult because Wills is a union member, and insisted that they would follow up with further investigation. (*Id*.) When plaintiffs asked Jim Miller about the investigation a month later, Miller told him "we're still working on it." (Dokken Aff., Ex. 1, at 251.)

Defendant contends that at the time of this investigation, it was not aware of any evidence that the noose had been put up the prior week, and was not informed of any prior racial incidents. Defendant also contends that Wills's story about the rope having been up since the prior summer was corroborated. Defendant points to Benson's statements that the noose had been up since the prior summer and to a similar statement from Paul Courchane, another of defendant's employees. Defendant later concluded that Courchane's story of the noose being hung "in connection with some form of non-racist, unrelated joke, was unsubstantiated." (Memorandum in Support of Motion for Summary Judgment, at 13.) Defendant contends, however, that the state of the evidence at the time of its investigation supported this conclusion. It is undisputed that Wills was not disciplined in any way for the incident.

On February 8, 2006, Burns filed a complaint with the Equal Employment Opportunity Commission ("EEOC").   On March 15, 2006, Dortch did the same. Plaintiffs allege that following these complaints, defendant retaliated against them. Burns notes that he was "reprimanded" for violating a company policy restricting personal cell phone use.  (Dokken Aff., Ex. 1, at 143-44.)   Burns alleges that other employees were routinely permitted to use cell phones for personal use, and that he was unfairly singled out.  Burns also alleges that after reporting the noose, Burger unfairly criticized his work and cursed at him.  In addition, Burns got into an altercation with another employee, who told him to "shut [his] fucking mouth and do as [he] is f'ing told."  Burns responded by telling the employee "that I would rip his kidneys out or I would take his kidneys out and I would feed it to him."  (Dokken Aff., Ex. 1, at 148.) Burns and the other employee were both suspended for the incident.  Both plaintiffs add that other employees mocked them for reporting the noose, and Burns alleges that other employees began to get more hours than him, despite his seniority.  The EEOC issued a right to sue letter on August 31, 2006, and this action followed.

## ANALYSIS

### I.     STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to

return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.     HOSTILE WORK ENVIRONMENT (COUNTS 1 AND 3)

In counts 1 and 3 of their complaint, plaintiffs contend that defendant subjected them to a hostile work environment in violation of 42 U.S.C. § 1981, Title VII, and the MHRA.[3]  Defendant first argues that several of the factual allegations underlying plaintiffs' claims are time-barred.  Before filing a civil action under Title VII, a person must file a charge with the EEOC "within 300 days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e).  Under the MHRA, a plaintiff must either file an administrative charge of discrimination or commence a lawsuit within one year of the offending conduct.  *See* Minn. Stat. § 363A.28, subd. 3.  As noted above, Burns initially filed an administrative charge of discrimination on February 17, 2006, and Dortch initially filed his charge on March 15, 2006.  Defendant notes that numerous incidents described by plaintiffs occurred more than 300 days and/or more than one year prior to those dates.

As plaintiffs point out, however, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be

---

[3] At oral argument, plaintiffs confirmed that they do not intend to pursue any other race discrimination claims in addition to their hostile work environment claims.

considered by a court for the purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Here, the incident involving the noose indisputably occurred within the filing period for both Title VII and the MHRA. Accordingly, the Court considers plaintiffs' allegations in their entirety.

Defendant next argues that plaintiffs have failed to establish a prima facie case for a hostile work environment claim. To meet their burden, plaintiffs must show that: (1) they belong to a protected group; (2) they were subjected to unwelcome harassment; (3) a causal nexus exists between the harassment and their group membership; and (4) the harassment affected a term, condition, or privilege of their employment. *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1059 (8th Cir. 2007). "Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment." *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 652 (8th Cir. 2003). "In addition, for claims of harassment by non-supervisory personnel, [plaintiffs] must show that [their] employer knew or should have known of the harassment and failed to take proper action." *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1195 (8th Cir. 2006).

Taking the evidence in the light most favorable to plaintiffs, there is no serious dispute as to whether they belong to a protected group, were subjected to unwelcome harassment, or whether the harassment was connected to their group membership. The Court focuses its analysis, then, on whether this harassment was sufficient to alter the terms, conditions, or privileges of plaintiffs' employment, whether defendant knew, or

should have known, of this harassment, and whether defendant took proper remedial action.

### A.    Severe and Pervasive Harassment

In determining whether plaintiffs have provided sufficient evidence of severe and pervasive harassment, the Court begins with the noose incident.   As has been noted elsewhere:

> [T]he noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence. It is impossible to appreciate the impact of the display of a noose without understanding this nation's opprobrious legacy of violence against African-Americans.  One study notes that from 1882, the earliest date for reliable statistics, to 1968, 3,446 African-Americans died at the hands of lynch mobs.
> * * *
> The effect of such violence on the psyche of African-Americans cannot be exaggerated.

*Williams v. N.Y. City Housing Auth.*, 154 F. Supp. 2d 820, 823-24 (S.D.N.Y. 2001) (citations omitted).  In short, defendant's occasional descriptions of the noose as a mere "rope" are woefully out of touch both with this nation's history and with the shameful but inescapable significance of this symbol.  Taking the evidence in the light most favorable to the plaintiffs, this symbol was displayed in defendant's warehouse just days after the holiday celebrating the life of Martin Luther King Jr.   Moreover, the noose was discovered after an evening when the truck assigned to Burns was the only one parked in the warehouse, suggesting that Burns was intended to see it.  This incident alone is strong evidence of harassment sufficient to alter the terms, conditions, and privileges of plaintiffs' employment.  *Cf. Moring v. Arkansas Dep't of Corr.*, 243 F.3d 452, 456 (8th

Cir. 2001) ("[W]e are unaware of any rule of law holding that a single incident can never be sufficiently severe to be hostile-work-environment sexual harassment.").

In addition, plaintiffs have described a series of racially hostile comments, including (1) the "fetch, boy" comment; (2) racist jokes; (3) multiple uses of the word nigger; and (4) a suggestion that Dortch resembled an African-American being lynched, made by the very employee who later admitted hanging the noose.  In addition to this language being offensive on its own, in each case the context for the comments amplifies their severity.   As to the "fetch, boy" comment, Burns testified that (1) he was specifically warned by a supervisor that Mahoney may make racist comments; (2) Mahoney made such comments; and (3) the supervisor told Burns that he should try not to pay attention.  Burger's warning suggests that defendant was aware of Mahoney's conduct, that it had been consistent enough to attract attention, and that defendant had not corrected it.  As to the jokes and uses of the word nigger – some of which allegedly happened in the presence of supervisors – Burns alleges that he was again told not to pay attention.  Moreover, in one instance, Burns testified that his co-workers looked to him expecting a fight, suggesting a particularly hostile situation.   Finally, the lynching comment was of course followed by the hanging of an actual noose.

Defendant notes that the Eighth Circuit has addressed offensive language similar to that at issue here, and found it insufficient to demonstrate a hostile work environment. *See, e.g.*, *Canady v. Wal-Mart Stores, Inc.*, 440 F.3d 1031, 1035-36 (8th Cir. 2006). Moreover, while the incidents described by plaintiffs were undoubtedly offensive, they appear to have been spread over the course of several years. *See Green v. Franklin Nat'l*

*Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006) ("[I]f comments are sporadic . . . they are unlikely to establish a hostile work environment claim.") (quotation omitted). As plaintiffs point out, however, none of the cases cited by defendant also involved a noose. While offensive comments alone may often be insufficient, this Court sees no reason why they may not be considered a relevant factor – or viewed in a different light – when they are accompanied by more serious incidents, such as the central incident at issue here. *See Baker v. John Morrell & Co.*, 382 F.3d 816, 828 (8th Cir. 2004) ("[W]e view the totality of the circumstances in determining whether there is a hostile work environment."); *Hathaway v. Runyon*, 132 F.3d 1214, 1222 (8th Cir. 1997) ("A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents.") (quotations omitted). The noose incident not only is extreme in its own right; it, along with defendant's response addressed below, also lends credibility to plaintiffs' further allegations, and the notion that a poisonous environment existed at earlier times as well. Taking the evidence of all of these incidents together, in the light most favorable to the plaintiffs, this Court concludes that there is sufficient evidence of severe and pervasive harassment that altered the terms, conditions, or privileges of plaintiffs' employment.

### B.    Defendant's Knowledge of the Harassment

As to whether defendant "knew or should have known" of the harassment, *see Gordon*, 469 F.3d at 1195, the Court finds sufficient evidence in the record to satisfy this requirement as well. As an initial matter, defendant was indisputably made aware of the

noose.  Defendant contends that it was not clear that this was a racially hostile gesture, in light of the information that was available at the time of its investigation.  Taking the facts in the light most favorable to the plaintiffs, however, this incident provided notice of extreme racial hostility.  The noose alone was suggestive of racial violence, for the reasons discussed above.  Indeed – lest there be any danger of defendant overlooking this significance – plaintiffs specifically informed defendant's managers that this was their interpretation.  In addition, Jim Miller, one of the investigators, had allegedly witnessed another employee referring to Burns as a nigger.  Moreover, while defendant contends that Wills's story was initially corroborated, it concedes that Courchane's "corroboration" later turned out to be "unsubstantiated."  This shift in the evidence would have been further reason to be suspicious.  In sum, there is a genuine issue of material fact as to whether defendant had notice of the noose's racial implications.

As to defendant's knowledge of the earlier incidents, viewing the evidence in the light most favorable to the plaintiffs, (1) Burger, a supervisor,[4] specifically warned Burns that he may be subjected to racial harassment, and then was notified when his prediction was fulfilled; (2) Burger was informed of racist jokes and uses of the word nigger; (3) Burger witnessed a use of the word nigger without intervening; and (4) as noted above, Jim Miller witnessed a use of the word "nigger" before he became a manager. This Court agrees that plaintiffs' case is weakened by their failure to officially report each of the incidents they have alleged.  However, "a plaintiff is not necessarily required

---

[4] While defendant sought to minimize Burger's stature at oral argument, it ultimately conceded that he was a supervisor.

to report the harassment through an official complaint procedure." *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1124 (8th Cir. 2007).  Here, Burns described several informal reports to Burger, one of his supervisors.  Pursuant to defendant's employment policy manual, whenever harassment was "brought to [Burger's] attention," he was required to either "report or deal with" the incident.  (Dahl Aff., Ex. A, Doc. 2.)

Moreover, "[i]f authorized agents with a reporting duty (or persons reasonably believed to have such a duty) acquire knowledge of . . . harassment, then the corporation acquired such knowledge." *Sims v. Health Midwest Physician Servs. Corp.*, 196 F.3d 915, 921 (8th Cir. 1999).  Here, defendant's employment policy manual includes the requirement that supervisors make a report to the general manager of human resources whenever they either receive a report of harassment *or observe it*.  (Dahl Aff., Ex. A, Doc. 2.)  Taking the evidence in the light most favorable to the plaintiffs, Burger was aware of Mahoney's prior harassment, in addition to his harassment of Burns; made repeated comments indicating awareness that "some of the guys" were likely to express racist sentiments; was aware of multiple uses of the word nigger and racist jokes; and witnessed an incident where an employee used the word nigger, in circumstances where other employees expected Burns to want to fight.  In addition, Jim Miller was aware of the spinning rims incident, and carried that knowledge with him when he became a manager.  While it is unclear whether this knowledge would have been sufficient for a hostile work environment claim on its own, when placed alongside the noose incident it creates a genuine issue of material fact as to defendant's knowledge of severe and pervasive racial hostility.

## C.     Defendant's Response

Finally, the Court concludes that there is sufficient evidence that defendant failed to take proper remedial action.  As to the noose, defendant contends it responded appropriately by conducting a thorough investigation, and came to a reasonable conclusion that this particular noose was not an expression of racial hostility.  For the reasons discussed above, however, the Court concludes that there is a genuine issue of material fact as to whether defendant had notice of the noose's racial significance.  If defendant had such notice, a jury may reasonably conclude that its failure to discipline Wills in any way was grossly inadequate.  Moreover, taking the evidence in the light most favorable to plaintiffs, this lack of response was consistent with Burger's earlier failure to address Mahoney, his failure to respond meaningfully to reports and observations of racially hostile comments, and with Jim Miller's alleged indifference to a use of the word nigger.  In short, there does not appear to be evidence of any meaningful response to the racial harassment alleged by plaintiffs, let alone "remedial action reasonably calculated to end the harassment."[5]  *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1265 (8th Cir. 1997).  Accordingly, this Court concludes that there is a genuine issue of material fact as to whether defendant adequately responded to knowledge of severe and pervasive racial harassment.

---

[5] While defendant points to the recent disciplining of an employee who referred to Burns as the "black bandit," this response to a recent, separate incident is insufficient to address the earlier, more severe harassment alleged by plaintiffs.

In sum, there is sufficient evidence in the record for plaintiffs' hostile work environment claims to survive summary judgment. Accordingly, defendant's motion for summary judgment is denied as to counts 1 and 3 of plaintiffs' complaint.

## III.   RETALIATION (Counts 2 and 4)

Plaintiffs also allege that defendant retaliated in response to their discrimination complaints, in violation of Title VII, *see* 42 U.S.C. § 2000e-3, 42 U.S.C. § 1981, and the MHRA, *see* Minn. Stat. § 363A.15. To make out a prima facie case of retaliation, plaintiffs must show: "(1) they engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir. 2007); *see Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 781, 785 (8th Cir. 2007) (applying this standard to retaliation claims brought under the MHRA); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1059 (8th Cir. 1997) (noting that the elements of retaliation claims brought under § 1981 and Title VII are the same). "The materially adverse action prong is objective, requiring us to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions." *Id.* (quotations omitted).

Plaintiffs point to four examples of allegedly adverse actions: (1) general ostracism and taunting inflicted by their co-workers; (2) Burns's suspension following his altercation with a co-worker; (3) verbal reprimands directed at Burns for violations of a

company cell phone policy; and (4) criticism of Burns's work by a supervisor.  The Court concludes that on the basis of the record before it – and the particular circumstances in which these actions allegedly occurred – plaintiffs have not made a sufficient showing of a materially adverse action.

As to the comments from their co-workers, defendants have not alleged actions that would have dissuaded a reasonable employee from making further complaints.  As to Burns, plaintiffs cite to just one instance where a co-worker mockingly asked if he was going to file harassment charges, and then broadly asserts that this was being said by "a lot of people."  (Dokken Aff., Ex. 1 at 290.)  As to Dortch, plaintiffs also cite to just one specific incident, where a co-worker mockingly asked another co-worker if he was "being racist" by suggesting that Dortch had injured his hand.  (Dokken Aff., Ex. 2 at 268.)  Such stray comments from colleagues do not rise to the level necessary to establish a materially adverse employment action.  *See Tademe Saint Cloud State Univ.*, 328 F.3d 982, 992 (8th Cir. 2003).

As to Burns' suspension, he acknowledged in his deposition that this occurred after an altercation where he told another employee "that I would rip his kidneys out or I would take his kidneys out and I would feed it to him."  (Dokken Aff., Ex. 1 at 290.) Burns does not allege that this altercation was related to race or his EEOC complaint, and acknowledges that the other employee was also suspended for the incident.  The Court concludes that a suspension in those circumstances would not have deterred a reasonable employee from making further discrimination complaints.

As to the cell phone incident, Burns acknowledges that he had used his cell phone for personal reasons during work hours, and that defendant did not formally discipline him in any way.  Rather, Burns merely alleges that he was told to avoid having his cell phone in his work truck, a claim defendant disputes.  Burns also acknowledges that this followed another cell phone incident two years earlier, when defendant discovered he had run up a $400 bill on a company cell phone.  Even assuming that Burns was restricted from carrying his personal cell phone in his work truck, the Court concludes that this informal resolution of an acknowledged, repeated rule violation is not sufficient to constitute a materially adverse employment action.

As to the alleged criticism of his work, Burns points to a single day when Burger cursed at him for not working quickly.  While the fact that this occurred shortly after the noose report is suspicious, this single incident of hostility is insufficient to constitute an adverse employment action.  *Cf. Shockney v. Ramsey County*, 493 F.3d 941, 950 (8th Cir. 2007).

Finally, Burns also alleges that defendant retaliated by reducing his work hours.  Such a material change in Burns's employment, if proven, would likely qualify as an adverse employment action.  *See Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851, 859 (8th Cir. 1998).  Regardless of whether there is sufficient evidence of this reduction, however, Burns has failed to provide sufficient evidence that it was causally connected to his discrimination complaints.  Plaintiffs' brief does not offer a specific date for this work reduction other than "[s]ince his complaints."  (Memorandum in Opposition to Summary Judgment, at 10.)  Nor do plaintiffs cite to anywhere in the record that includes a specific

date. (*Id.*) After an independent review of the record, this Court has uncovered just one explanation of the specific reductions plaintiffs are alleging, and that explanation states that it covers reductions that have occurred "since October, 2006." (Dahl Aff., Ex. A., Doc. 10.) This falls approximately eight months after Burns's initial complaint to the EEOC, and approximately seven months after the initial complaint by Dortch. In the absence of any further evidence linking these changes to plaintiffs' complaints – or evidence specifically detailing reductions that occurred at an earlier date – this lengthy time gap is inadequate to demonstrate a causal connection. *See Buytendorp v. Extendicare Health Servs., Inc.*, 498 F.3d 826, 836 (8th Cir. 2007) ("An inference of a causal connection between a charge of discrimination and an adverse employment action can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation.") (quotation omitted); *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006) (noting that "an interval as brief as two months did not show causation for purposes of establishing a retaliation claim"). Accordingly, counts 2 and 4 of plaintiffs' complaint are dismissed.

## IV.    NEGLIGENCE (Count 5)

Count 5 of plaintiffs' complaint alleges that defendant was negligent in its training, supervision, and retention of its employees.[6] Defendant notes – and plaintiffs do

---

[6] Specifically, plaintiffs' complaint alleges "[d]efendant is negligent in training, retaining and supervising managers and others described herein." (Complaint, at ¶43.) In plaintiffs' brief, they also argue that they have brought a claim for negligent infliction of emotional distress. (Memorandum in Opposition to Summary Judgment, at 20-21.) This claim, however, was not pled in plaintiffs' complaint.

not dispute – that Minnesota courts do not recognize a claim for negligent training. *See Mandy v. Minn. Mining & Mfg.*, 940 F. Supp. 1463, 1473 (D. Minn. 1996). Accordingly, that claim is dismissed with prejudice, and the Court turns to plaintiffs' claims for negligent supervision and negligent retention.

The MHRA includes an exclusivity provision that precludes separate common law negligence actions. *See* Minn. Stat. § 363A.04; *Moss v. Advance Circuits, Inc.*, 981 F. Supp. 1239, 1252 (D. Minn. 1997). "[A] plaintiff may simultaneously pursue claims under the MHRA and common law negligence that arise from the same underlying facts." *Moss*, 981 F. Supp. at 1252 (*citing Vaughn v. Northwest Airlines, Inc.*, 558 N.W.2d 736, 744-45 (Minn. 1997)). "However, a plaintiff's negligence claims must be founded on a duty of care independent from duties owed under the MHRA." *Id*. In *Moss*, a court applying these principles held that negligent retention and negligent supervision claims were preempted where "[p]laintiff's negligence claims [were] based entirely on [an employer's] actions after being made aware of [an employee's] alleged discriminatory conduct." 981 F. Supp. at 1252. The Court encounters a nearly identical situation here. Plaintiffs' brief explanation does not address *Moss*, and appears to base their claims on defendant's duty to address racial harassment in the workplace, a duty that falls squarely within the province of the MHRA. Accordingly, this Court concludes that plaintiffs' negligence claims are preempted by the MHRA's exclusivity provision, and count 5 of plaintiffs' complaint is dismissed.

This case will be placed on the Court's next available trial calendar.

**ORDER**

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 14] is **GRANTED in part** and **DENIED in part** as follows:

1.      As to plaintiffs' hostile work environment claims (Counts 1 and 3), defendant's motion for summary judgment is **DENIED**.

2.      As to plaintiffs' retaliation claims and negligence claims (Counts 2, 4, and 5), defendant's motion for summary judgment is **GRANTED**.  Counts 2, 4, and 5 of plaintiffs' complaint are **DISMISSED WITH PREJUDICE**.


DATED:    July 8, 2008                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                      JOHN R. TUNHEIM
                                          United States District Judge